BISHOP, The MARIA. See Case No. 9,077.

BISHOP, (ARNOLD v.) See Case No. 552.

BISHOP, (GOODYEAR v.) See Cases Nos. 5,558 and 5,559.

BISHOP, (GREENE v.) See Case No. 5,763.

BISHOP, (JOHNSON v.) See Case No. 7,-373.

---

## Case No. 1,440.

### BISHOP v. STOCKTON et al.

[1 West. Law J. 203.]

Circuit Court, W. D. Pennsylvania. Nov. Term, 1843.[1]

CARRIERS—INJURY TO STAGE COACH PASSENGER—INTOXICATION OF DRIVER.

*Held*, that the proprietor of a stage coach is liable for an injury done to a passenger by upsetting, in consequence of the driver being intoxicated, although his reputation as a driver was until then of the highest character, and he had never been known to be intoxicated before.

[See Stokes v. Saltonstall, 13 Pet. (38 U. S.) 181; McKinney v. Neil, Case No. 8,865;

[1] [Affirmed by the supreme court in Stockton v. Bishop, 4 How. (45 U. S.) 156.]

Maury v. Talmadge, Id. 9,315; Peck v. Neil, Id. 10,892.]

[See note at end of case.]

At law. The action was brought to recover damages for injuries sustained by Miss [Harriet] Bishop by the upsetting of a stage of the defendants [Lucius W. Stockton and Daniel Moore,] in January, 1842. The upset occurred 1½ miles east of Uniontown, Fayette county. Both parties agreed that the stage was upset, that Miss Bishop's arm was broken, her elbow badly strained or bruised, her face cut or scratched, in several places, a wound in the scalp two inches long, and the upper lip cut and swollen so as to produce some deformity which is gradually subsiding.

Miss Bishop was first treated for her injuries by Dr. Campbell in Uniontown. About thirty-six hours after the injury, she left Uniontown and travelled by stage to Wheeling, thence by steamboat to Marietta, Ohio, and up the Muskingum to McConnelsville, where she was attended by Dr. Thompson, for about eight weeks.

The plaintiff's counsel asked not only compensatory but exemplary damages, charging the accident to the drunkenness of the driver. The driver, James Corbin, took the box at Farmington, 10 miles east of Uniontown; then, according to the testimony of James McCaully, (the driver who delivered the passenger to him,) he was duly sober. Mr. Bishop, brother of the plaintiff, and Mr. Wadsworth, testified that the driver stopped at Snyder's, three miles from Farmington. Snyder swore that he was drunk when he came into his house; he asked for liquor and was refused; two miles further he again stopped at Downer's tavern, went into the house three times, remaining altogether about 15 minutes; here he was overtaken by another stage driver, James Smith. Smith testified that Corbin was drunk, staggering; and that each of them watched the horses while in turn they went in to drink. Smith observing Corbin's condition told him to drive slow. Corbin answered: "If you expect to keep up with me you must drive damned fast," mounted his box, cracked his whip, shouted, and in three minutes was out of sight. Here the descent of the Laurel hill commences; the passengers say that up to this time their ride was agreeable, but now became extremely rough and rapid. They descended the mountain, however, passed along the level below, ascended a little hill, descended it at a trot, and somewhere near the bottom struck a log, were upset, and Miss Bishop injured as before described, the other passengers escaping unhurt. Corbin fell under the stage, and was considerably injured. Corbin was sworn, and he also proved that he was drunk when the injury happened—that he remembers nothing that took place from the time he left Downer's, the last stopping place. He denied to Stockton and his agent that he was

drunk, and even denied it lately to Mr. Lausen. He has not been in the employ of Stockton since.

The defendants proved that Corbin was a sober, trust-worthy man, never known to be drunk, scarcely ever seen to drink—one of the best drivers on the route—a crack driver—and their counsel labored to discredit his testimony against himself before the jury; he took the pledge a year ago, and is now, at least, a sober man. Defendants proved that Stockton, who resides in Uniontown, is more than usually attentive to his coaches, and watchful of the security of his passengers, and their counsel insisted that exemplary damages could not be given against a stage proprietor who exerted all due diligence, care and attention for the safety of his passengers; that exemplary or vindictive damages are given only to punish neglect, incompetency and heedlessness, but their client was proved derelict in nothing that could be required from human skill and care. They seemed to concede that, as the law stands, stage owners are answerable in compensatory damages for injuries sustained by passengers, though they result from accident to which no blame attaches. They ascribed the upset to the darkness of the night (happened between 5 and 6 o'clock in the evening) and the log which was proved to be lying endwise over the summer road, reaching nearly if not quite to the macadamized part of the turnpike. The counsel for the plaintiff relied upon the testimony of the two male passengers, Snyder, Smith, and Corbin himself, for the proof that he was drunk, and from the fact that the log is lying on the same place still that it could not be in the road of stages, or occasion danger to a sober and capable driver.

The defendants urged that the greater part of the pain and injury to the arm was occasioned by Miss Bishop's traveling home before it was healed.

The plaintiffs answered that she was a stranger, poor, and likely to suffer more from distress and anxiety abroad, sick, than by traveling home at the time she did. Dr. Campbell advised that it was better for her to travel by easy stages immediately after the accident than after the bone would commence to knit. When she arrived at home in Ohio, the arm was crooked, the bandage disarranged, and the elbow joint very painful; the joint is now perfectly restored, and the arm well and strong, but an inch shorter than before. The fracture was an oblique one.

Miss Bishop's friends asked Stockton at Uniontown, the day after the injury, to refund so much of the fare as they had paid, for the proportion of the route from Uniontown to Wheeling, (they had paid their passage from Hagerstown through) so that they might leave the road at Brownsville, and go down the river by steamboat from that place—he refused, but gave them a stage to themselves, under their own direction, with the privilege of keeping it a week, if they pleased, on the road to Wheeling, (a distance of sixty miles.) They actually made the journey in one day—and that the second day after the accident, the gentlemen supporting the sufferer to protect her from the jolting of the stage,—her sister-in-law was in company

Biddle & McCandless, for plaintiff.

Washington, Mahon & Loomis, for defendants.

Before BALDWIN, Circuit Justice, and IRWIN, District Judge.

BALDWIN, Circuit Justice, charged the jury at great length upon the law of the case. He instructed the jury that the case concerns the public as well as the parties. That all stage proprietors, owners of vessels, steamboats, railroad cars, &c., are bound to provide vessels, vehicles, &c., every way fitted to encounter all the ordinary perils of the journey, but are not accountable for accidents against human foresight, skill, and care. That common carriers, such as transporters of merchandise, are absolutely liable for all accidents; but stage proprietors are liable for any want of proper care in providing and conducting their vehicles. That the whole machinery, animate and inanimate, are the agents of the proprietor, and for each and all he is answerable. That these principles ought to be rigidly enforced, but at the same time both cautiously and truly applied to the facts of the case. It is as much a duty to protect the owners who do their whole duty, as it is to protect passengers and the public. The mere fact of an upset raises a legal presumption of negligence—it supposes a default and supplies, (in legal contemplation,) the evidence of such negligence and unskilfulness as makes the owners responsible in damages. This presumption may be met and refuted by the circumstances of the case; the presumption is then destroyed, and the plaintiff must prove such default. If there is no default on the part of the defendants the plaintiff cannot recover in this action.

The proprietor of a stage coach does not warrant the security of his passengers, absolutely, as in the case of a common carrier, and is not responsible for mere accidents. He warrants their safety so far only as human vigilance and care can go. If the driver was drunk at the time of the accident, but up to that time was trustworthy and sober, the proprietor is responsible; no previous care or caution of the proprietor will excuse him; the liability of the defendants depends upon the conduct as well as upon the character of the driver. If the defendants have failed to account for the accident in such a way as will entirely justify them and their agents, then the enquiry will be what amount of damages shall be given? Shall they be compensatory or exemplary? Compensatory damages are given to restore or make

whole again, or make reparation for loss, injury, or suffering, past and future. In estimating damages, more than the expenses of the plaintiff are to be included; pain, whether bodily or mental, may be allowed for. When a woman is injured or deformed, the injury to her personal appearance may properly be considered in the verdict. All injuries, whether to the person, mind, or pocket, may be taken into account; even the position of the complainant and her condition in life may, also, be considered. The extent of the damages is in the discretion of the jury. Thus far, damages are merely compensatory. But further vindictive or exemplary damages may be given to indemnify the public for past injuries and damages, and to protect the community from future risks and wrongs. Contracts for carrying passengers are made not only with the party to the transaction, but they are also made with the public as strongly as if they were so expressed and signed and sealed. But to justify exemplary damages, the injury must be more than a mere private loss or injury, it must have been occasioned by such negligence, unskilfulness or recklessness as concerns the safety of the traveling public.

The circumstances to be considered here in this case are the drunkenness of the driver, his conduct before, at the time of the accident, and afterwards. Circumstances both before and after the disaster may either mitigate or aggravate the injury, and ought to be so considered. If the owner was in fact ignorant of the driver's intemperate habits, this fact might lessen the verdict so far as vindictive damages are concerned, although in law the owner is the driver, and he is just as responsible for the act of his agent as for his own. The fact of the plaintiff's leaving Uniontown before her arm was healed up, I think ought not to lessen your verdict; her remaining there was perhaps as perilous to her as her traveling homeward when she did. If the defendants have performed all their duty they are not liable. The facts are for you, it is for the bench to lay down the law which governs the case.

The jury returned a verdict for the plaintiff for $6,500, and costs of suit.

NOTE [from the original report]. I know of no legal matters in which the public at large are more interested, than those which relate to the safety of passengers and property, in the various modes of transportation now in use. Hence I have transferred the report of the above case, at length, from the newspapers to the pages of this journal. From the same source I learn that, at the United States circuit court recently sitting in Rhode Island, the captain of a steamboat was sentenced to pay a fine of $300, for not having the requisite safety boats, as provided by the act of congress. Also, that a captain of a steamboat was recently tried, in Philadelphia, on charge of manslaughter, for running down a small boat in the Delaware river, whereby a man was drowned; but the proof of negligence was not strong enough to procure a conviction.

[NOTE. On writ of error by defendants, the supreme court, in 4 How. (45 U. S.) 155, af-firmed the judgment of the circuit court, upon the ground that, according to "the right of the cause and matter of law" as appeared by the pleadings and the verdict, judgment was properly rendered for the plaintiff below.

[For proceedings in the supreme court to quash a writ of fieri facias issued in the court below, after a writ of error had been sued out, see Stockton v. Bishop, 2 How. (43 U. S.) 74.]